**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————————
)
)                **Bankruptcy Case No. 10-267**
**IN RE: ANDRE CHREKY, INC.,**   )                **Chapter 11**
      **Debtor.**         )
)
—————————————————————————)
)
**RONNIE BARRETT,**           )
      **Appellant,**      )
)
         **v.**         )                **Civil Action No. 10-1963 (RCL)**
)
**ANDRE CHREKY, INC.,**     )
      **Appellee.**     )
)
—————————————————————————)

—————————————————————————
)
)                **Bankruptcy Case No. 10-268**
**IN RE: ANDRE CHREKY,**    )                **Chapter 11**
      **Debtor.**         )
)
—————————————————————————)
)
**RONNIE BARRETT,**           )
      **Appellant,**      )
)
         **v.**         )                **Civil Action No. 10-1965 (RCL)**
)
**ANDRE CHREKY,**         )
      **Appellee.**     )
)
—————————————————————————)

## MEMORANDUM OPINION

Before the Court are two appeals from the bankruptcy court. In both cases, creditor

Jennifer Thong entered into a settlement agreement with the debtor—Andre Chreky in one case

and Andre Chreky, Inc. in the other case. After conducting a hearing and making findings of fact,

Bankruptcy Judge Teel approved the settlement. Creditor Ronnie Barrett objected below to the

Bankruptcy Judge's approval of the settlement, and she now appeals the Bankruptcy Judge's approval of the settlement. Specifically, in Civil Action No. 10-1963, Ms. Barrett appeals from the Bankruptcy Judge's approval of a settlement between Jennifer Thong and Andre Chreky, Inc. in Bankruptcy Case No. 10-267. In Civil Action No. 10-1965, Ms. Barrett appeals from the Bankruptcy Judge's approval of a settlement between Jennifer Thong and Andre Chreky in Bankruptcy Case No. 10-268.

The Court finds that these two appeals involve identical issues, so this opinion will address both appeals. The Court will address Ms. Barrett's third bankruptcy appeal—Civil Action No. 10-1964—in a separate opinion issued this same date.

In both Civil Actions No. 10-1963 and 10-1965, the Court finds that the Bankruptcy Judge's findings of fact were not clearly erroneous, and the Bankruptcy Judge's decision to approve the settlement was not an abuse of discretion. Accordingly, the Court will affirm the Bankruptcy Judge's approval of the settlement in both cases.

## I.    BACKGROUND

### A.  District Court Litigation in *Barrett v. Chreky*, Civil Action No. 07-250, and *Thong v. Chreky*, Civil Action No. 06-1807

In Civil Action No. 07-250, Ronnie Barrett sued Andre Chreky and Andre Chreky, Inc. for sexual harassment and retaliation. After a two-week trial in February and March 2010, a jury found for Ms. Barrett on these claims. In accordance with the jury verdict, the Court entered judgment for Ms. Barrett and found Mr. Chreky and Andre Chreky, Inc. jointly and severally liable for $2.3 million—$300,000 in compensatory damages, and $2 million in punitive damages.

In Civil Action No. 06-1807 before this Court, Jennifer Thong sued Mr. Chreky and Andre Chreky, Inc. for sexual assault, harassment, and retaliation. Trial in this case was

scheduled to begin on March 22, 2010. On March 16, Ms. Thong made an offer to settle her case for $3 million, which Mr. Chreky and Andre Chreky, Inc. rejected.

On March 19, both Mr. Chreky and Andre Chreky, Inc. filed petitions for relief under Title 11 of the U.S. Bankruptcy Code in the above-captioned bankruptcy cases—Bankruptcy Case No. 10-267 for Andre Chreky, Inc., and Bankruptcy Case No. 10-268 for Mr. Chreky. As required by the bankruptcy code, the Court stayed Civil Actions No. 07-250 and 06-1807. Thus, at the time Mr. Chreky and Andre Chreky, Inc. filed for bankruptcy, Ms. Barrett had won a judgment of $2.3 million in damages, but the Court had not yet determined attorneys' fees and costs. Ms. Thong had not yet gone to trial. After the chapter 11 bankruptcy proceedings began, Ms. Barrett and Ms. Thong both initiated adversary proceedings against Mr. Chreky in the bankruptcy court in Adversary Proceedings No. 10-10038 and 10-10039. In those adversary proceedings, both Ms. Barrett and Ms. Thong allege that their claims against Mr. Chreky are non-dischargeable. On July 22, Ms. Thong filed proofs of claim against both Mr. Chreky and Andre Chreky, Inc. for $8.5 million plus attorneys' fees and costs. (Civil Action No. 10-1963 Record ("R.") 62 ¶4.)

On August 13, Mr. Chreky and Andre Chreky, Inc. made an offer to Ms. Thong to settle her claims for $7 million, subject to approval by the Bankruptcy Judge. (R. 36–37.) This sum would consist of all compensatory damages, attorneys' fees, expenses, and costs of suit, and $2 million would be declared non-dischargeable in Mr. Chreky's bankruptcy proceeding. (*Id.*) The settlement offer did not provide for punitive damages. (*Id.*) This settlement would resolve both Ms. Thong's district court litigation in Civil Action No. 06-1807 and her bankruptcy litigation in Adversary Proceeding No. 10-10039. (R. 24.) That same day, Ms. Thong accepted that settlement offer. (R. 33–34.) On November 8, after the Bankruptcy Judge had approved the

settlement, Ms. Thong moved for final judgment in Civil Action No. 06-1807. (Mot., Nov. 8, 2010, ECF No. 158.) Without opposition, the Court granted the motion and entered final judgment for Ms. Thong for $7 million. (Order, Dec. 3, 2010, ECF No. 159.)

### B. Bankruptcy Court Litigation in *In re Andre Chreky, Inc.*, Bankruptcy Case No. 10-267, and *In re Andre Chreky*, Bankruptcy Case No. 10-268

On August 18, in Bankruptcy Cases No. 10-267 and 10-268, Mr. Chreky and Andre Chreky, Inc. filed a joint motion for approval of their settlement. (R. 3–31.) On September 8, Ms. Barrett filed an objection to that motion, arguing that the settlement discriminated against her as a creditor, as further discussed below. (R. 54–58.) Ms. Thong filed a reply to that objection. (R. 61–66.)

On September 29, the Bankruptcy Judge held a hearing on the motion and orally granted the motion. (R. 67.) On October 29, the Bankruptcy Judge signed the order authorizing and approving the settlement. (Supplemental R. 3–5.)

At the September 29 hearing, the Bankruptcy Judge heard argument and testimony on the joint motion and Ms. Barrett's objection. Mr. Chreky, Andre Chreky, Inc., Ms. Thong, and Ms. Barrett were all represented by counsel at the hearing. (J.A. Tr. 9/29/10 ("Tr.") 1–2.) The Bankruptcy Judge heard testimony from one witness—Paul Kiernan, counsel to Andre Chreky, Inc.—who testified about his assessment of the settlement. (Tr. 24–55.) Counsel for Ms. Barrett had an opportunity to cross-examine him. (Tr. 35–45.) No party, including Ms. Barrett, produced any evidence other than Mr. Kiernan's testimony. (Tr. 55–56.) At the hearing, the Bankruptcy Judge orally approved the settlement. He signed a written order approving the settlement on October 29. (Supp. R. 3–5.)

### C. The Bankruptcy Judge's Findings of Fact in Approving the Settlement

Based Mr. Kiernan's undisputed testimony, the Bankruptcy Judge made the following findings of fact at the hearing, on the basis of which he approved the $7 million settlement. In Ms. Thong's case, "if the litigation were to go forward, and if the jury believed Ms. Thong, and believed her expert witnesses, [the estates of Mr. Chreky and Andre Chreky, Inc. would be subject to] a judgment in excess of $10 million." (Tr. 75:18–23.) "Although punitive damages were sought in the matter, . . . the $7 million settlement . . . was a fair settlement of the compensatory damage issue alone." (Tr. 76:3–7.)

As to the issue of costs incurred if this case went to trial, the Bankruptcy Judge found that "[t]he two estates did indeed face extensive risk of an adverse judgment in the District Court if the Thong litigation went forward." (Tr. 76:11–14.) "The Defendants had no ability to call expert witnesses regarding emotional damages because prior counsel had failed to disclose any experts from the deadline set by the District Court with respect to emotional damage experts." (Tr. 76:15–19.) Further, "[t]he litigation avoids the necessity of Mr. and Mrs. Chreky participating in what threatens to be a three-week trial if the matter is not settled, and it exposes the Debtors to press coverage, which is obviously adverse to a beauty salon." (Tr. 77:6–10.) The settlement "saves substantial attorney's fees that would be incurred by the estates." (Tr. 81:23–24.) "[T]he litigation had dragged on and attorney's fees were being incurred, which obviously were increasing the amount that would be owed to Ms. Thong if she prevailed." (Tr. 79:22–80:1.)

As to the discrepancy between Ms. Thong's previous settlement offer of $3 million and her eventual acceptance of a $7 million settlement offer, the Bankruptcy Judge found that Ms. Thong's $3 million settlement offer "was for $3 million cash in hand, whereas the settlement

being considered today is for her to have an allowed claim of $7 million against the estate. That does not equate to $3 million in hand." (Tr. 79:17–21.)

As to the fact that Ms. Thong's settlement provided for only compensatory damages—not punitive damages—the Bankruptcy Judge found that "[o]n the part of Ms. Thong, she would have had a reason not to press the recovery of punitive damages in the settlement negotiations, because such punitive damages are likely to receive less favorable treatment, and probably, practically a recovery of nothing [because i]n a Chapter 7 liquidation case, punitive damages would come last, behind a distribution of a liquidation of assets to unsecured creditors." (Tr. 78:8–19.)

As to the sufficiency of negotiations, the Bankruptcy Judge found that "[t]he negotiations were at arm's length. They were serious and hard fought. Both estates were represented by separate counsel." (Tr. 77:11–13.)

As to the discrepancy between the verdict for Ms. Barrett and the settlement with Ms. Thong, the Bankruptcy Judge found that Ms. Thong's "case was substantially different from the Barrett case. Ms. Thong allegedly suffered physical, sexual assault. She suffered more dramatic harassment than Ms. Barrett had, and there was retaliation against her as well. . . . [T]he Thong litigation contained much more explosive allegations of misconduct on the part of the Debtors." (Tr. 76:20–77:5.) "There's no disparate treatment of Ms. Barrett. She is free to enter into negotiations just like Ms. Thong did, and she's free to continue to pursue her request that the claim be determined to be non-dischargeable." (Tr. 81:11–15.) "Ms. Barrett remains free to litigate her non-dischargeability claim to establish how much is actually dischargeable. She remains free to negotiate with Mr. Chreky, what he is willing to say will be treated as a non-dischargeable claim." (Tr. 80:15–20.)

Based on these findings of fact, the Bankruptcy Judge concluded that "[a]ccordingly, the settlement that called for $7 million for compensatories and nothing for the punitives was within the range of reasonableness." (Tr. 76:8–11.)

## II.     STANDARD OF REVIEW

The Court reviews questions of law *de novo*. *Advantage Healthplan, Inc. v. Potter*, 391 B.R. 521, 537 (D.D.C. 2008); *In re Johnson*, 236 B.R. 510, 518 (D.D.C. 1999).

The Court reviews a bankruptcy court's findings of fact under the clearly erroneous standard. Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). "The burden of proof is on the party that seeks to reverse the bankruptcy court's holding, and that party must show that the court's holding was clearly erroneous as to the assessment of the facts and not simply that another conclusion could have been reached." *Advantage Healthplan*, 391 B.R. at 537 (citations and quotations omitted). Under the clearly erroneous standard, a reviewing court may not "reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty . . . if it undertakes to duplicate the role of the lower court." *Anderson v. Bessemer City*, 470 U.S. 564, 563 (1985); *Advantage Healthplan*, 391 B.R. at 537. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *Advantage Healthplan*, 391 B.R. at 537. "To be clearly erroneous, a decision must strike us as wrong with

the force of a five-week-old, unrefrigerated dead fish." *In re Johnson*, 236 B.R. at 518 (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)).

The Court reviews a bankruptcy court's approval of a settlement under the abuse of discretion standard. *In re Chira*, 567 F.3d 1307, 1312 (11th Cir. 2009); *In re Iridium Operating LLC*, 478 F.3d 452, 461 n.13 (2d Cir. 2007); *In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006); *In re Mailman Steam Carpet Cleaning Corp.*, 212 F.3d 632, 634 (1st Cir. 2000); *Advantage Healthplan*, 391 B.R. at 553. The Court also reviews a bankruptcy court's evidentiary rulings under the abuse of discretion standard. *See Gen. Elec. Co. v. Joiner*, 522 136, 141 (1997) ("[A]buse of discretion is the proper standard of review of a district court's evidentiary rulings."); *Haarhuis v. Kunnan Enter., Ltd.*, 177 F.3d 1007, 1015 (D.C. Cir. 1999) (reviewing a bankruptcy court's evidentiary ruling under the abuse of discretion standard). "[A]n abuse of discretion occurs when the [bankruptcy] court relies on clearly erroneous findings of fact, fails to consider a relevant factor, or applies the wrong legal standard." *Pigford v. Johanns*, 416 F.3d 12, 23 (D.C. Cir. 2005).

Thus, the Court will "apply an abuse of discretion standard to [a bankruptcy court's] decision to approve the settlement, which encompasses the clearly erroneous standard with respect to [a bankruptcy court's] findings of facts and the *de novo* standard with respect to [its] legal conclusions." *Advantage Healthplan*, 391 B.R. at 553 n.17.

## III. <u>DISCUSSION</u>

In both Civil Actions No. 10-1963 and No. 10-1965, Ms. Barrett sets forth the following issues before the Court:

> 1)    Whether the bankruptcy court's conclusion that a $7 million settlement was within the range of reasonableness was clearly erroneous where the debtor had filed bankruptcy on March 19, 2010 to avoid trial on March 22, 2010 of a matter in which the plaintiff had made a $3 million demand on March 16, 2010 and there was no evidence of any changed circumstances.

2)      Whether the bankruptcy court's conclusion that a $7 million settlement was within the range of reasonableness was clearly erroneous because it was based on the proponent's assertion, without any objective evidence.

3)      Whether the bankruptcy court's finding was clearly erroneous, that the settlement, reflecting a sum for compensatory damages, attorneys' fees, expenses, and costs of suit, but without any allocation to punitive damages, was reasonable or in the best interest of the creditors.

4)      Whether the bankruptcy court abused its discretion by relying on such clearly erroneous findings of fact in approving the settlement.

5)      Whether the bankruptcy court abused its discretion by relying on an exhibit it refused to admit into evidence in an earlier hearing, and which was not offered in support of the proposed settlement, as the basis for finding that the lack of any allocation to punitive damages was reasonable.

As a preliminary matter, the Court finds that there are no questions of law on appeal subject to *de novo* review. The Court will review the five issues on appeal under the legal standards set forth by Ms. Barrett, as neither Mr. Chreky nor Andre Chreky, Inc. has challenged the applicability of those standards. Mr. Chreky and Andre Chreky, Inc. have therefore waived any argument that a different standard of review should apply to these issues. Thus, the Court will review the first three issues under the clearly erroneous standard, and the last two issues under the abuse of discretion standard.

### A.  The Bankruptcy Judge's Findings of Fact Were Not Clearly Erroneous.

#### 1.  *The Bankruptcy Judge's Conclusion that a $7 Million Settlement Was Reasonable in Light of Ms. Thong's Earlier $3 Million Settlement Offer Was Not Clearly Erroneous.*

Ms. Barrett argues that because Ms. Thong made a $3 million settlement offer to Mr. Chreky and Andre Chreky, Inc. just before her scheduled trial date, a $7 million settlement is unreasonable. The Court disagrees.

First, evidence of the amount of an earlier settlement offer is inadmissible in a hearing to approve the amount of a later settlement. Federal Rule of Evidence 408(a)(1) expressly provides: "Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or *amount of a claim that was disputed as to validity or amount*, or to

impeach through a prior inconsistent statement or contradiction: *furnishing or offering or promising to furnish or accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise the claim*." (emphasis added). "The Federal Rules of Evidence . . . apply in cases under the Code." Fed. R. Bankr. P. 9017. Thus, Ms. Barrett cannot use evidence of the $3 million settlement offer to prove whether the $7 million settlement is reasonable.

Second, even considering the evidence of the $3 million settlement offer, and assuming— as does Ms. Barrett—that there were no changed circumstance between the time of the $3 million offer and the $7 million offer, the Court cannot find that the Bankruptcy Judge's finding was clearly erroneous. The Bankruptcy Judge found that the $3 million offer "was for $3 million cash in hand, whereas the [$7 million settlement] is for her to have an allowed claim of $7 million against the estate." (Tr. 79:17–20.) He further found that the $3 million offer and $7 million settlement were "not the same thing": "It's money in hand in one instance, and it's a claim against an estate for possibly only pro rata distribution." (Tr. 18–22.) He based these findings on the testimony of the sole witness—Mr. Kiernan. Mr. Kiernan testified that the $3 million offer was "'Pay us $3 million immediately,' you know, 'Wipe everything out and pay us now.'" (Tr. 48:8–9.) Mr. Kiernan testified that, by contrast, the $7 million settlement was "for the amount of the judgment," not a settlement to pay Ms. Thong $7 million directly. (Tr. 47:25– 48:2.) Further, Mr. Kiernan testified that this $7 million settlement included approximately "a million and a half [dollars] for the attorney's fees." (Tr. 44:17–18.) It is unclear based on the record whether the $3 million offer included attorneys' fees. Based on these acknowledged differences between the terms of the two settlement offers, the Court is not "left with the definite and firm conviction that a mistake has been committed." *U.S. Gypsum Co.*, 333 U.S. at 395.

Thus, the Bankruptcy Judge's conclusion that a $7 million settlement agreement was reasonable, in light of the earlier $3 million offer, was not clearly erroneous.

### 2. The Bankruptcy Judge's Conclusion that the Settlement Was Reasonable in Light of Mr. Kiernan's Undisputed Testimony at the Hearing Was Not Clearly Erroneous.

Ms. Barrett argues that because the Bankruptcy Judge relied only on the testimony of one witness, rather than relying on "objective evidence," the Bankruptcy Judge's approval of the settlement was clearly erroneous. The Court disagrees.

First, it is a novel proposition to the Court to suggest that sworn testimony is not "objective evidence." A fact finder may certainly rely on both oral and documentary evidence. *See* Fed. R. Bankr. P. 8013.

Second, the Court finds that the Bankruptcy Judge's sole reliance on Mr. Kiernan's testimony was proper. Mr. Kiernan was counsel to Andre Chreky, Inc. during the preparation for Ms. Thong's trial and during settlement negotiations with Ms. Thong, so he was perhaps in the best position to testify about the creation of the settlement. It is true that "a bankruptcy judge cannot accept the proponent's word that the settlement is reasonable, nor may the judge merely 'rubber stamp' a proposal." *Advantage Healthplan*, 391 B.R. at 554 (citations and quotations omitted). But the Bankruptcy Judge did not simply accept Mr. Kiernan's conclusion that the settlement was reasonable. Rather, the Bankruptcy Judge heard Mr. Kiernan's testimony, in which Mr. Kiernan relied on his professional expertise as an attorney to testify about his assessment of Ms. Thong's claims and his client's potential liability at trial. The Bankruptcy Judge relied on Mr. Kiernan's more than twenty-five years of experience and practice in "commercial and civil litigation, business disputes, jury trials, appeals, and on occasion, bankruptcy work," as well as the experience of his partner and co-counsel, "Marilyn Holifield,

who is a national labor employment unfair practices lawyer." (Tr. 25:7–21.) Mr. Kiernan outlined the specific ways in which he thought the settlement was reasonable, and the Bankruptcy Judge did not simply rubber stamp Mr. Kiernan's assessment. The Bankruptcy Judge permitted direct, cross, redirect, and recross examination of Mr. Kiernan, and then followed up with his own questions about the reasonability of the settlement. Based on this undisputed testimony, the Bankruptcy Judge then found that the settlement was reasonable.

Mr. Kiernan testified that Ms. Thong had alleged four or five physical attacks, and "there was certainly discovery material sufficient to support having them proceed to the jury." (Tr. 26:15–25.) He assessed that "the likelihood of a defense verdict, that is a clean verdict in favor of the defense, was going to be less than 50 percent." (Tr. 28:24–29:1.) Ms. Thong was alleging damages "for emotional distress, humiliation. There were . . . punitive damages, obviously. There were damages related to her medical condition following these alleged attacks. There was testimony that was going to be presented about the long term impact on Ms. Thong, the continuing impact on her, in terms of her relationship, in terms of her life. There were expert witnesses whose testimony had been submitted for trial." (Tr. 27:3–11.) He testified that this Court's rulings precluded the defense from putting forth expert witnesses to rebut Ms. Thong's expert witnesses. (Tr. 30:17–18.) He assessed that "we certainly thought that a judgment north of $10 million was possible." (Tr. 29:14–15.) He further testified that Mr. Chreky and his wife— Serena Chreky—would have to be at trial every day during a projected three-week trial, which meant that they could not be at their salon during that time. (Tr. 27:17–21, 32:7–12.) The trial would generate publicity "locally and probably nationally." (Tr. 32:21–22.)

He assessed his client's potential liability in light of the jury verdict in Ms. Barrett's case. He testified: "I don't want to be quoted as agreeing with Mr. Rose [counsel for Ms. Thong], but I

agree with Mr. Rose's assessment of the allegations." (Tr. 31:3–5.) "The nature of the allegations made by Ms. Thong against Mr. Chreky, in her case, were vastly different [from Ms. Barrett's allegations]." (Tr. 31:8–9.) "[H]aving had the Barrett case go to trial on a case that was smaller, if you will, we still got to a total number of compensatory, punitive, and alleged attorney's fees of four and a half million dollars, and so we thought it was obviously prudent to take into account, what effect did this testimony have on a jury, what were the outcomes if you take those allegations and can get to a four and a half million dollar number all in, and you take more explosive allegations, where could a jury have would up." (Tr. 31:21–32:6.) He testified that he was not aware of "any other jury verdict in the U.S. District Court for sexual harassment under the D.C. Human Rights Act, that got a jury verdict of [the amount of the settlement] . . . in an individual case." (Tr. 44:20–45:2.) Thus, although Mr. Kiernan did not provide evidence of jury verdicts in D.C. other than Ms. Barrett's, he was able to establish a range of potential jury verdicts based on Ms. Barrett's verdict and his assessment of Ms. Thong's claims as "more explosive allegations" than Ms. Barrett's.

Mr. Kiernan was testifying in support of the settlement, so one could argue that he had an incentive to say that the $7 million settlement was reasonable. But he had no incentive to inflate Ms. Thong's claims or make her case look stronger than it was. (*See* Tr. 26:18–22 (Mr. Kiernan: "Just if I may, Your Honor, I mean, obviously I'm here to testify to answer the questions. It's a little bit of an unusual spot because if we have to try the case if you don't approve the settlement, I don't want it to be I'm conceding the points.").) Thus, it was reasonable for the Bankruptcy Judge to conclude that Mr. Kiernan properly assessed his client's potential liability in light of Ms. Thong's allegations. Further, this Court will not question the Bankruptcy Judge's findings as to the credibility of witnesses, as the Bankruptcy Judge was in a better position to assess Mr.

Kiernan's credibility than is this Court on appeal. *See* Fed. R. Bankr. P. 8013 ("[D]ue regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.").

Third, the Court finds that it was proper for the Bankruptcy Judge to rely on only the testimony of one witness in approving a settlement. A court is not required to have a trial to approve a settlement—the entire purpose of which is to obviate the need for a trial. *See Advantage Healthplan*, 391 B.R. at 554 ("[A] bankruptcy judge 'need not hold a mini-trial or write an extensive opinion every time he approves or disapproves a settlement.'" (quoting *In re Fishell*, 47 F.3d 1168 (6th Cir. 1995))). At the hearing, Ms. Barrett was permitted to cross-examine Mr. Kiernan—which she did—and also to produce evidence in support of her objection—which she did not. The Bankruptcy Judge then relied on all the evidence produced during the hearing in reaching his conclusions and approving the settlement. Thus, the Bankruptcy Judge's conclusion that the settlement was reasonable—in light of the undisputed testimony of Mr. Kiernan at the hearing—was not clearly erroneous. The Bankruptcy Judge did not simply rubber stamp the settlement nor accept Mr. Kiernan's assertion that the settlement was reasonable. Rather, the Bankruptcy Judge relied on Mr. Kiernan's assessment of his client's potential liability and other factors that weighed into his professional judgment as an attorney to settle the case for $7 million rather than attempt to litigate it further.

### 3. The Bankruptcy Judge's Conclusion that the Settlement Was Reasonable when it Accounted for Compensatory Damages, Attorneys' Fees, Expenses, and Costs of Suit—But Not Punitive Damages—Was Not Clearly Erroneous.

Ms. Barrett argues that the Bankruptcy Judge's finding that the settlement was reasonable was clearly erroneous because the settlement provided for compensatory damages, attorneys'

fees, expenses, and the costs of suit, but had no provision for punitive damages. The Court disagrees.

First, the Bankruptcy Judge's conclusion that the settlement was reasonable was supported by Mr. Kiernan's testimony about legal issues relating to a jury instruction about punitive damages at trial. Mr. Kiernan testified that "there was a very unsettled legal issue about whether, and to what extent, punitive damages were going to happen. . . . We had a lot of arguments about not including punitive damages in the case." (Tr. 29:19–30:2.) "The arguments were about whether given the unique situation of the fact that we were going to a jury trial with two Defendants that were already in bankruptcy, and one of the traditional tests for punitive damages, one of the traditional instructions to the jury is you should award an amount that would punish the Defendant but not drive him into bankruptcy." (Tr. 35:18–24.) *See* D.C. Std. Civ, Jury Instr. No. 16-3 (May 2010) ("To determine the amount of the [punitive damages] award you may consider the relative worth of the defendant at the time of trial . . . ."). "[I]f you try to get punitive damages from somebody who demonstrably can't pay them, you run a substantial risk of getting that reversed, or somehow affected by the judge, and that was why the Plaintiff was pushing the compensatory damage side of the case, not the punitive side, because of that legal risk of getting a judgment against someone who was in bankruptcy, and what effect that would have on enforceability." (Tr. 41:3–11.) Ms. Barrett argues that because this Court had not yet decided whether Mr. Chreky and Andre Chreky, Inc. could discuss the fact of their bankruptcy filings at trial—and thus argue that punitive damages were not proper because they would drive them further into bankruptcy—the Bankruptcy Judge could not rely on the possibility of such a ruling. The Court disagrees. When settling a case, parties attempt to predict future court rulings and settle a case with those predictions in mind. That is what happened here. The parties assessed

the risks and potential outcomes of a ruling by this Court, and apparently concluded that there was a substantial risk that this testimony would be admissible.[1] The Bankruptcy Judge did not predict this outcome, but rather explained what the parties would argue at trial, as well as their assessment of the viability of those arguments. Based on Mr. Kiernan's testimony—as set out above—the Bankruptcy Judge found that Ms. Thong might not seek punitive damages at trial because she would be nervous about how this legal issue would resolve itself. This finding was proper.

Second, the Bankruptcy Judge's conclusion that the settlement was reasonable was supported by Mr. Kiernan's testimony that Ms. Thong suffered more compensable harm than did Ms. Barrett. As set out above, Mr. Kiernan believed that Ms. Thong's allegations were much more "explosive" than those of Ms. Barrett, as she was alleging four or five physical attacks and damages for emotional distress. Thus, Mr. Kiernan testified that in Ms. Thong's case, "we thought our greatest exposure was on the compensatory damage side." (Tr. 52:16–17.) Ms. Thong's evidence could support either a compensatory damages or punitive damages award at trial: "[T]he very same evidence, if admitted and believed by the jury regarding the conduct, the physical assaults and so forth, fit into the compensatory damage theory regarding emotional distress, humiliation, continuing medical and physical problems, and I know from discussions with Mr. Rose, he was looking at that as his primary target because there were concerns about where punitive damages would go." (Tr. 52:21–53:4.)

Third, the Bankruptcy Judge's conclusion that the settlement was reasonable in light of the damages demand in Ms. Thong's complaint was not clearly erroneous. At the time of trial, only two of Ms. Thong's claims remained—(1) a claim for violation of the D.C. Human Rights

---

[1] The Court makes no comment on how it would actually have decided this issue if the issue were properly before it.

Act due to a hostile work environment, sexual harassment, and physical attacks, and (2) a claim for retaliation. In her complaint, on each count, she demanded "compensatory damages in an amount to be determined at trial but no less than $1,000,000 or a greater amount as deemed appropriate by a jury [and] punitive damages in an amount to be determined at trial but no less than $3,000,000 or a greater amount deemed appropriate by a jury." (Civil Action No. 06-1807, Complaint 18–19, Oct. 18, 2006, ECF No. 1-1.) Ms. Thong had also alleged in her complaint counts of assault, battery, and intentional infliction of emotional distress, among other claims, but the Court dismissed those claims. (Civil Action No. 06-1807, Summ. J. Order, July 13, 2009, ECF No. 99.) Ms. Barrett thus argues that because Ms. Thong only requested a total of $2 million in compensatory damages on her two remaining claims, an award of $7 million is unreasonable. The Court disagrees. A damages demand in a complaint does not limit the amount of damages that a plaintiff may later demand either at trial or during settlement negotiations. Further, Ms. Thong's complaint expressly stated that this $2 million compensatory damages demand was a floor, and that she could be entitled to a larger amount if the evidence at trial were to show that she was so entitled. Thus, this $2 million demand does not restrict Ms. Thong's ability to demand a large damages award during settlement negotiations, and it does not render a $7 million award unreasonable. Further, Ms. Thong's $8.5 million proof of claim in the bankruptcy court shows that she later valued her claim more highly than she initially did when filing her complaint.

Thus, the Court cannot find that the Bankruptcy Judge's factual findings were clearly erroneous. Applying this deferential standard, the Court is not "left with the definite and firm conviction that a mistake has been committed" by the Bankruptcy Judge in making these

findings. *U.S. Gypsum Co.*, 333 U.S. at 395. And the Court certainly cannot smell the putrid

stench of a five-week-old, unrefrigerated dead fish. *In re Johnson*, 238 B.R. at 518.

**B. The Bankruptcy Judge Did Not Abuse His Discretion in Approving the Settlement.**

**1. The Bankruptcy Judge Did Not Abuse His Discretion by Relying on His Factual Findings in Approving the Settlement.**

"[A]n abuse of discretion occurs when the [bankruptcy] court relies on clearly erroneous

findings of fact . . . ." *Pigford*, 416 F.3d at 23. As detailed above, the Court finds that the

Bankruptcy Judge's findings were not clearly erroneous. Thus, the Bankruptcy Judge did not

abuse his discretion by relying on his factual findings in approving the settlement.

**2. The Bankruptcy Judge's Reliance on an Exhibit that Was Not in Evidence Was Harmless Error.**

Ms. Barrett argues that in approving the settlement, the Bankruptcy Judge referred to an

exhibit that was not in evidence. Specifically, Ms. Barrett argues that the Bankruptcy Judge

relied on an exhibit that she had offered into evidence at the September 24, 2010, bankruptcy

hearing, which the Bankruptcy Judge had refused to admit into evidence. The exhibit was a

document in which Mr. Chreky and Andre Chreky, Inc. had listed certificates of deposit and

related accounts, which Mr. Chreky identified as his assets. Ms. Barrett sought to introduce this

exhibit to show that the accounts belonged solely to Mr. Chreky, countering Mr. Chreky's

contention that the accounts belonged to him and his wife as tenants by the entireties. That

document was part of the basis for a stipulation in Ms. Barrett's trial as to Mr. Chreky's $6

million net worth. When approving the settlement, the Bankruptcy Judge said: "[I]n the Barrett

litigation, there was a flat stipulation read to the jury, that there [was] $6 million in net worth on

the part of the Debtors, which disregarded the fact that many of the assets were held by Mr. and

Mrs. Chreky as tenants by the entirety." (Tr. 77:18–23.) In an order in Civil Action No. 10-1964

issued this same date, the Court will remand the case to the Bankruptcy Judge for further findings on whether Mr. Chreky holds these assets solely or as a tenant by the entireties with his wife.

Neither Mr. Chreky nor Andre Chreky, Inc. opposes Ms. Barrett's argument, so the Court will accept Ms. Barrett's contention that the Bankruptcy Judge improperly relied on this exhibit. But any reliance on this exhibit is harmless error. "[T]o warrant reversal, the error must have been prejudicial: It must have affected the outcome of the [bankruptcy] court proceedings." *Czekalski v. LaHood*, 589 F.3d 449, 453 (D.C. Cir. 2009). The Bankruptcy Judge's reliance on this exhibit was only one reason for approving the settlement. As detailed throughout this opinion, the Bankruptcy Judge had numerous reasons for approving the settlement, and this slight misstep did not affect the outcome of the bankruptcy proceedings. The Court is convinced that the Bankruptcy Judge would have come to the same conclusion even without relying on this exhibit. Thus, his reliance on the exhibit is harmless error.

### 3. *The Bankruptcy Judge Did Not Abuse His Discretion in Deciding to Approve the Settlement.*

A bankruptcy court may approve a settlement pursuant to Federal Rule of Bankruptcy Procedure 9019(a). "A bankruptcy court's decision to approve a settlement must be an informed one based upon an objective evaluation of developed facts. Indeed, a bankruptcy judge cannot accept the proponent's word that the settlement is reasonable, nor may the judge merely 'rubber stamp' a proposal." *Advantage Healthplan*, 391 B.R. at 554 (citations and quotations omitted). Rather, a bankruptcy judge must "determine that a proposed compromise . . . is fair and equitable." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). In determining whether a settlement is "fair and equitable," "the bankruptcy court should consider: (1) probability of success in the litigation; (2) difficulties, if

any, with collection, (3) the complexity of the litigation, including the expense, inconvenience, and delay attendant to the litigation; and (4) the interest of creditors." *Advantage Healthplan*, 391 B.R. at 554 (citing *TMT Trailer Ferry*, 390 U.S. at 424). "The experience and knowledge of the bankruptcy court judge is of significance in assessing the propriety of the settlement." *Id.* at 553. In determining the reasonableness of a settlement, a bankruptcy judge must decide only whether the settlement falls between the lowest and highest points in the range of reasonableness. *See In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983).

Here, the Bankruptcy Judge considered the relevant factors in determining whether the settlement was fair and equitable. First, he found that Ms. Thong had a high probability of success in the litigation. He found that "[t]he two estates did indeed face extensive risk of an adverse judgment in the District Court if the Thong litigation went forward." (Tr. 76:11–14.) "[I]f the litigation were to go forward, and if the jury believed Ms. Thong, and believed her expert witnesses, [the estates of Mr. Chreky and Andre Chreky, Inc. would be subject to] a judgment in excess of $10 million." (Tr. 75:18–23.) He found that Ms. Thong's allegations were much worse than Ms. Barrett's allegations, and that Ms. Barrett had recovered a $2.3 million verdict, plus costs and attorneys' fees. (Tr. 76:20–24.) Further, he found that Mr. Chreky and Andre Chreky, Inc. could not call expert witnesses at trial to rebut Ms. Thong's expert witnesses' testimony about her emotional damages. (Tr. 76:15–19.) Thus, it would be more difficult for them to contest an emotional damages award.

Second, he did not consider difficulty with collection, because that factor is not relevant when the settlement is against an estate. Third, he found that the expense, inconvenience, and delay attendant to the litigation weighed in favor of settlement. He found that the settlement "saves considerable attorney fees, expenses to the estate. It avoids adverse publicity that would

be detrimental to the operation of the Debtor's business. It avoids the time that would be spent by Mr. and Mrs. Chreky participating in what could be a two to three-week trial . . . and saves substantial attorney's fees that would be incurred by the estates." (Tr. 81:17–24.)

Fourth, he found that it was in the best interest of the creditors to approve the settlement. In addition to her arguments as to the reasonableness of the settlement that the Court rejected above, Ms. Barrett argues that the settlement discriminates against her as a creditor because it might give Ms. Thong priority as a creditor in a bankruptcy proceeding. She argues that because her jury verdict consists of primarily punitive damages—whereas Ms. Thong's settlement consists entirely of compensatory damages, of which $2 million is deemed non-dischargeable— Ms. Thong's claim would receive higher priority. *See* 11 U.S.C. § 726(a)(2), (a)(4) (claims for punitive damages are distributed from an estate after other allowed unsecured claims). The Bankruptcy Judge confronted this potential discrimination head-on at the beginning of the hearing, stating: "Characterizing the settlement as only compensatory works an injustice to other creditors because if they were characterized as punitive damages, that would be a basis for giving them less favorable treatment under a plan." (Tr. 23:9–13.) During Mr. Kiernan's testimony, the Bankruptcy Judge asked Mr. Kiernan expressly: "Can you explain to me why the settlement does not include any punitive damages whatsoever?" (Tr. 52:1–3.) After Mr. Kiernan articulated the reasons, the Bankruptcy Judge asked: "Was there ever any discussion of the Plaintiff not wanting to have any recovery characterized as punitive damages in order to maximize her recovery in the bankruptcy case?" to which Mr. Kiernan replied: "Not that I recall, Your Honor. I don't believe so." (Tr. 53:23–54:3.) The Bankruptcy Judge was in the best position to assess the credibility of this testimony. On the basis of counsel's argument and Mr. Kiernan's testimony, the Bankruptcy Judge found: "There's no disparate treatment of Ms. Barrett. She is free to enter into negotiations

just like Ms. Thong did, and she's free to continue to pursue her request that the claim be determined to be non-dischargeable." (Tr. 81:11–15.) He further found: "On the part of Ms. Thong, she would have had a reason not to press the recovery of punitive damages in the settlement negotiations, because such punitive damages are likely to receive less favorable treatment, and probably, practically a recovery of nothing in light of the best interest of the creditor's test under Section 1129(a)(7) of the Bankruptcy Code, which refers you to what would happen in a Chapter 7 liquidation case." (Tr. 78:8–16.) "In any event, Mr. Kiernan's testimony establishes that $7 million to compromise the compensatory damages being sought by Ms. Thong was reasonable, and the case law is clear that as long as a settlement is within a reasonable range of settlements, it ought to be approved." (Tr. 79:6–11.) The Bankruptcy Judge thus considered potential discrimination to Ms. Barrett, but found that there was no such discrimination. Based on the testimony at the hearing, the fact that Ms. Thong's claims were far more egregious than Ms. Barrett's, and the Court's deference to the Bankruptcy Judge's expertise on issues such as the schedule of payment of creditors in bankruptcy, the Court cannot conclude that the Bankruptcy Judge abused his discretion by concluding that the settlement agreement does not discriminate against Ms. Barrett.

Finally, as noted above, the Bankruptcy Judge did not merely rubber stamp the settlement. Rather, he heard extensive testimony and argument on the reasonableness of the settlement. He asked his own questions of the witness and of counsel. He made extensive findings of fact in approving the settlement.

Thus, the Court cannot find that the Bankruptcy Judge abused his discretion in approving the settlement. He relied on facts that were not clearly erroneous, considered all of the relevant factors, and applied the proper legal standard. *Pigford*, 416 F.3d at 23. It is not the duty of this

Court on appeal to attempt to replicate the Bankruptcy Judge's findings and analysis, but rather to determine whether the Bankruptcy Judge's decision to approve the settlement was so egregious that it constituted an abuse of his discretion as a bankruptcy judge. It did not.

## IV.    <u>CONCLUSION</u>

Accordingly, for the reasons stated, in Civil Action No. 10-1963, the Court will affirm the bankruptcy court's approval of the settlement between Jennifer Thong and Andre Chreky, Inc. In Civil Action No. 10-1965, the Court will affirm the bankruptcy court's approval of the settlement between Jennifer Thong and Andre Chreky.

A separate order consistent with this memorandum opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on May 2, 2011.